**CARDEN LIVESAY**
— LTD —
ATTORNEYS AT LAW

Joshua W. Carden, SBN 021698
419 East Juanita Avenue, Suite 103
Mesa, AZ 85204
joshua@cardenlivesay.com
T. (480) 345-9500
F. (480) 345-6559
*Attorney for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Nicholas Alozie, individually, and on behalf of others similarly situated. <br><br> Plaintiff, <br><br> v. <br><br> Arizona Board of Regents, a political subdivision of the State of Arizona, Dr. Michael Crow, in his official and individual capacity, Dr. Mark Searle, in his individual capacity, Dr. Duane Roen, in his individual capacity, Dr. Jeffrey Cohen, in his individual capacity, Dr. Nancy Gonzalez, in her official capacity, Dr. Joanna Grabski, in her official capacity, <br><br> Defendants. | **ORIGINAL COMPLAINT** <br><br> **(JURY TRIAL REQUESTED)** |

Plaintiff Nicholas Alozie, by and through undersigned counsel, seeks relief in this Original Complaint against Defendants as follows:

**INTRODUCTION**

1.  These civil rights claims of race discrimination, retaliation, and conspiracy involve a tenured Arizona State University professor who has experienced a coordinated campaign of discrimination and retaliation ever since pulling back the curtain on racial discrimination in ASU's hiring for leadership roles. Plaintiff prevailed at trial against ASU in 2021. This case presents the same pattern of discrimination and retaliation against him occurring <u>after</u> the issues raised in that



trial, including ASU's handling of his performance reviews, salary, and promotion efforts.

**PARTIES**

2. Plaintiff Nicholas Alozie (Dr. Alozie) is a resident of Maricopa County, Arizona, and, at all relevant times in this Complaint, an "employee" of ABOR within the meaning of the relevant statutes cited herein.

3. Defendant Arizona Board of Regents ("ABOR") is a political subdivision of the State of Arizona, capable of being sued under the statutes identified herein. All acts alleged in this Complaint occurred in Maricopa County, Arizona.

4. ABOR, at all times material hereto, upon information and belief employed over 500 persons.

5. Defendant Dr. Michael Crow was at all material times the president of Arizona State University, an agent for Defendant ABOR, and an "employer" of Plaintiff for purposes of the Section 1981 claim. This individual is named both in his individual and official capacities.

6. Defendant Dr. Mark Searle was at all material times a resident of Maricopa County, Arizona, a former Provost of ASU, and an agent for Defendant ABOR. This individual is named in his individual capacity only.

7. Defendant Dr. Duane Roen was at all material times a resident of Maricopa County, Arizona, a former Dean of ASU and supervisor of Plaintiff, and an agent for Defendant ABOR. This individual is named in his individual capacity only.

8. Defendant Dr. Jeffrey Cohen was at all material times a resident of Maricopa County, Arizona, a Dean and Professor at ASU, and an agent for Defendants ABOR, Roen, and or Searle during his service as chair of the search committee for the new Dean of Dr. Alozie's College. This individual is named in his individual capacity only.

9. Defendant Dr. Nancy Gonzalez was at all material times a resident of Maricopa County, Arizona, the present Provost of ASU, and an agent for Defendant ABOR. This individual is named in her official capacity only as a required Defendant necessary for injunctive relief.

10. Defendant Dr. Joanna Grabski was at all material times a resident of Maricopa County, Arizona, a Dean of ASU and supervisor of Plaintiff, an agent for Defendant ABOR, and



an "employer" of Plaintiff for purposes of the Section 1981 claim. This individual is named in her official capacity only as a required Defendant necessary for injunctive relief.[1]

11. At all times pertinent to this Complaint, ABOR's management officials were acting within the course and scope of their employment with ABOR; and as a result thereof, Defendant ABOR is responsible and liability is imputed for the acts and omissions of its management officials, as alleged herein, under the principle of *respondeat superior*, agency, and/or other applicable law.

## JURISDICTION AND VENUE

12. The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 2000e-5, and 28 U.S.C. § 1331.

13. The unlawful employment practices described herein were committed within the State of Arizona and under color of state law, on Defendant's premises located in Maricopa County, State of Arizona.

14. Accordingly, venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5.

## ALLEGATIONS COMMON TO ALL CLAIMS

15. Dr. Alozie has been an employee of Defendants since 1991.

16. He is a tenured ASU professor since 1994, presently a full professor and a founding faculty head of what is now the social science faculty group within the College of Integrative Sciences and Arts (CISA), with all the rights and privileges bestowed on that position by ASU and ABOR bylaws, faculty handbooks, written agreements, and state law.

17. In 2016, Dr. Alozie filed a lawsuit (2:16-cv-03944-ROS ("*Alozie I*")) against ABOR and specific individual officials, based partly on an EEOC charge in 2015 related to ASU's failure to grant him an interview for a Dean's position to which he had applied in 2014.

18. After a jury trial, Dr. Alozie won that lawsuit in August 2021 – the jury awarded over $300,000 in compensatory damages.

19. The issue decided by the jury in *Alozie I* was limited to whether Dr. Alozie had

---

[1] Plaintiff would like to make very clear upfront that Dean Grabski has treated him very well and that she is <u>only</u> named herein due to the procedural requirements of civil rights litigation related to equitable relief.

3

Case 2:23-cv-01845-DGC    Document 1    Filed 08/31/23    Page 4 of 15

experienced unlawful retaliation – specifically, not being granted a second-level interview for the Dean position - after he engaged in protected activity with a Dean search committee at his first interview.

20. The damages were similarly limited to that issue.

21. After the charge and *Alozie I* lawsuit were filed, and throughout the *Alozie I* lawsuit, Dr. Alozie began to experience additional forms of retaliation or discrimination that were not covered by *Alozie I* and all of which occurred after the close of discovery in that case.

22. Specifically, he has experienced almost continuous discrimination and retaliation in a) a subsequent promotion attempt; b) in his annual reviews near the time of trial and Dr. Roen and Searle's departure from ASU; c) in the inclusion of unlawful language in his annual employment contracts that conflict with express ABOR regulations; and d) in the setting of his compensation and provision of raises compared to other comparators.

**Promotion Denied - Again**

23. In September 2020, ASU opened up for candidate applications the Dean of College position for what is now CISA.

24. The only requirement listed for the job was the individual be a full Professor.

25. This is the same position that Dr. Alozie had competed for in *Alozie I*.

26. Despite their imminent departure from the University, then-Dean Roen, and then-Provost Searle, assembled the faculty search committee in order to conduct interviews and make recommendations of candidates.

27. Roen and Searle specifically included four individuals on the committee who were listed as adverse witnesses to Dr. Alozie in *Alozie I*, including one who had even filed a complaint against him.

28. Defendant Cohen was the chair of the search committee.

29. Upon information and belief, Defendants Roen, Searle and/or Cohen (with the possible input from President Crow who was directly involved in the last search that led to *Alozie I*) constructed the committee and instructed it to conduct interviews specifically in order to ensure that Dr. Alozie was not recommended for the position.

4

30. Upon information and belief, this was primarily because of Dr. Alozie's ongoing and previous protected activity, and also because of discrimination based on his race and national origin.

31. Indeed, despite meeting the qualifications for the position, Dr. Alozie he was not put forward as a recommended candidate for an interview.

32. The position was ultimately filled by Dean Grabski, a white female in March 2021.

33. While Dean Grabski has, in Plaintiff's estimation, been an excellent Dean of the College, Dr. Alozie has once again experienced direct discrimination and/or retaliation in his attempt to attain the dean position.

34. Dr. Alozie timely appealed his denial of the dean position to the Office of University Rights and Responsibilities as provided in the ASU policies and procedures raising race and retaliation claims.

35. Those policies also provide for a 90-day review process.

36. The university issued a denial of the appeal on or about June 15, 2023, more than a full year after the complaints were filed.

**Retaliatory Annual Reviews**

37. Despite being a Defendant and a material witness in *Alozie I*, Dean Roen performed Dr. Alozie' annual reviews for 2019 and 2020.

38. The review for 2019 was completed by then-Dean Roen in April 2020, just two months before *Alozie I* was initially set for trial.

39. The 2019 review was negative and its score was below that needed for Dr. Alozie to receive a merit increase to his salary.

40. It was the lowest rating that Dr. Alozie had received, and it cost him a raise.

41. Similarly, just before Dean Roen and Provost Searle departed ASU, Dean Roen issued Dr. Alozie another negative review for 2020.

42. Prior reviews for Dr. Alozie had been "Meritorious," and his subsequent reviews under Dean Grabski have been stellar.

43. Dean Roen prepared Dr. Alozie's 2019 and 2020 reviews by substantially departing



from the prescribed methodology and practices for conducting such reviews, including but not limited to consultation (or lack thereof) with appropriate members of CISA, substantially changing established standards of annual review, and limiting his considerations to criteria inappropriate for application to a faculty head.

44. Dean Roen did not deviate when it came to reviews for similarly-situated individuals who were not African-American and/or had not engaged in protected activity.

45. Upon information and belief, these negative reviews were prepared a) in order to paint Dr. Alozie to the jury as a bad employee; and/or b) in retaliation for Dr. Alozie's protected activity and participation in *Alozie I*, including the naming of many of these same individual-capacity Defendants therein, and administrative complaints about discrimination and retaliation.

46. Upon information and belief, Dean Roen collaborated with Provost Searle and/or President Crow to issue the negative reviews.

47. In April 2020, Dr. Alozie timely appealed the 2019 review to the Office of University Rights and Responsibilities as provided in the same ASU policies and procedures raising race and retaliation claims.

48. The same policies provide for a 90-day review process.

49. Defendant Searle issued a denial of the appeal on or about January 12, 2021 – approximately nine months later.

50. Dr. Alozie also timely appealed his 2020 review to the Office of University Rights and Responsibilities as provided in the ASU policies and procedures raising race and retaliation claims.

51. Again, policies provide for a 90-day review process.

52. Provost Gonzalez issued a denial of the appeal on or about July 22, 2022, also many months later.

53. These reviews are taken into consideration for many different things within ASU, including merit raises, promotions, appointments, etc.

54. The actions of the individual Defendants and on behalf of ABOR were premised on Dr. Alozie's race, national origin and/or in retaliation for his protected activity.



**Unlawful Appointment Contract Language**

55. To understand this legal violation, it is necessary to explain that tenure-track "professors" at any level (Full, Associate, Assistant from highest to lowest) ordinarily receive annual faculty "Notice of Appointment" letters from the Provost, which represent that individuals are being reappointed to their positions, including their titles and rate of pay for the employment period.

56. If the faculty member also serves as a faculty head, dean or other administrative appointment, the letter from the Provost historically has also included the information on the administrative appointment, including title of position and salary.

57. In June 2018 (during *Alozie I*), for the first time since becoming a faculty head, Dr. Alozie received an additional separate letter from then-Dean Roen that contained the following paragraph:

> Your fiscal salary as faculty head will be $127,980. Administrative appointments are made for one-year terms, but are renewable contingent upon satisfactory performance and the needs of the university. **Should it be decided at some future date that you will step down from your administrative appointment and return to the faculty on a full-time basis, your academic-year (9-month) base salary shall be 75% of your administrative fiscal-year salary at that time.** (emphasis added).

58. Upon information and belief, Defendants inserted this clause into Dr. Alozie's contract to make it economically impossible for him to return to being a professor alone without penalty – and since he has tenure, this is a way to keep a proverbial "sword of Damocles" handing over him and ready at all times to cause him financial harm in lieu of actual termination.

59. ABOR Policy 6-103 (adopted pursuant to state law) states:

> A. The Board delegates to university presidents the authority to enter employment contracts in which administrative personnel are changed to an academic assignment and to determine appropriate compensation for that assignment, consistent with applicable board policies.
>
> B. When a former university administrator who was employed on a fiscal year contract returns to an appointment as a faculty member on an academic year basis,



> **the academic year salary shall be determined by the president on the same basis as all other academic year faculty salaries.**
>
> 1. In no case shall the former administrator have any expectation that the academic year salary shall be set by dividing the previous fiscal year contract by 1.2 or by any other numerical factor.
>
> 2. The president shall consider the individual′s academic rank, length of time in that rank, prior achievements, potential for performance as a university faculty member and salaries of faculty peers in establishing the individual′s academic year salary. (emphasis added)

60. Despite this clear language, every year since 2018 that Dr. Dr. Alozie has been sent this additional faculty head appointment letter from the Dean of CISA (first from Defendant Roen and now Defendant Grabski), the unlawful formula artificially suppressing his salary has appeared.

61. Upon information and belief, Defendants Crow, Searle, and Roen worked together to have Dean Roen and now Dean Grabski to use this language from 2018-to avoid the application of ABOR policy 6-103, which would require a re-determination of Dr. Alozie's proper salary compared to other professors of his stature and tenure across ASU if he ceased his administrative appointment.

62. Dr. Alozie objected to Defendants Searle and Roen and Grabski that the faculty head appointment letter from CISA was unlawful, but no changes have been made.

63. No explanation has been given for the unlawful language in the CISA administrative faculty head appointment letter.

64. Without this unlawful clause, Dr. Alozie cannot dare step down from his 12-month administrative appointment and return to being only a nine-month faculty member without an <u>automatic</u> 25% pay cut (rather than have his salary equalized by ABOR policy), unless Defendants are enjoined from continuing this violation of ABOR policies.

65. Upon information and belief, one or more individual Defendants pick and choose where to implement this 75% percent contract language.

66. Upon information and belief, this language disproportionately impacts minority scholars in lower-level administrator positions and keeps them locked into lower salaries at ASU.



**Discriminatory Salary and Disparate Pay**

67. Dr. Alozie is a highly-experienced, highly-credentialed faculty member of ASU.

68. Additionally, he holds an advanced degree of greater difficulty and complexity (Political Economy) than that of many of his fellow professors in CISA, whose degrees are often in English or History.

69. Defendant ABOR sets ranges of faculty salaries, which are supposed to be determined in accordance with, *inter alia*, the criteria identified in ABOR Policy 6-103(B)(2).

70. Despite this, Dr. Alozie's salary (approximately $139,000 at this time) has lagged significantly behind those of his non-African-American colleagues for at least the last 11 years, and frequently matches someone at a much lower academic level.

71. In contrast, non-African-Americans have been frequently brought in as full professors at salaries higher than Dr. Alozie's, many times receiving that full salary for just working nine months as faulty members.

72. For example, Defendant Roen brought in a friend as a professor and associate dean of the college (thus, a faculty member and administrator), Dr. Asao Inoue, who was paid many thousands more than Dr. Alozie, although Dr. Inoue was self-evidently not as experienced in years of administration or ranking as Dr. Alozie.

73. Dr. Inoue, with no prior administrative experience and only four years' service as a full professor, served in that position for only 12 months and returned to faculty only on a nine-month faculty appointment.

74. Thereafter, Dr. Inoue's nine-month faculty salary was still many thousands more than Dr. Alozie's 12-month salary as an administrator (<u>and</u> more than 75% of Dr. Inoue's immediately prior 12-month administrative salary), despite Dr. Alozie having served for 18 years as a faculty head and 22 years as a full professor.

75. As another point of comparison, in 2021 (before the 2022 merit raises) there were five "full professor only" contracts just in CISA that paid between $149,000 and $302,000 to non-African-American employees.

76. As detailed above, if Dr. Alozie wanted to return to a nine-month full professor



appointment only, and relinquish his administrator duties, but for the unlawful clause in his contract, he should be comparable to these professors (along with other "faculty peers" across ASU) and should be paid accordingly – except for the unlawful language in the Dean's letter.

77. Regardless, his pay is substantially below that of his faculty peers.

78. Upon information and belief, the ongoing pay gap is due to Dr. Alozie's race and national origin, and/or in retaliation for his protected activity.

## ADMINISTRATIVE REMEDY EXHAUSTION

79. Plaintiff timely filed two charges of discrimination with the EEOC, alleging violations of Title VII based on race and national origin discrimination as well as retaliation. A true and correct copy of each charge is attached as Exhibit A.

80. The EEOC issued its Notice of Suit Rights for the first charge. A true and correct copy of that Notice is attached as Exhibit B.

81. The EEOC has not issued its Notice of Suit Rights for the second charge. Permission to amend will be sought to include that charge (which raises new facts, though not new claims) when it is received.

82. Plaintiff has filed suit within 90 days of his receipt of the first Notice.

83. All conditions precedent necessary to the filing of this lawsuit have been performed or have occurred.

## COUNT ONE – TITLE VII DISCRIMINATION
### ABOR only

84. By reference hereto, Plaintiff hereby incorporates the preceding paragraphs.

85. Plaintiff is a member of a protected group: African in national origin, and African-American in race.

86. Defendant has violated Title VII by engaging in direct discrimination and disparate treatment of Plaintiff because of his race and national origin.

87. The disparate treatment was un-welcomed by the Plaintiff.

88. As a result of the foregoing, Defendant is liable to Plaintiff for violation of Title VII.

89. Defendant's acts of discrimination in this regard were unlawful and intentional.



90. As a direct and proximate result of Defendant's conduct, Plaintiff has sustained damages in the form of lost wages, reduced salary, emotional distress, embarrassment, humiliation, loss of reputation, loss of self-esteem and enjoyment of life.

91. Plaintiff suffered and will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory practices until this Court grants relief.

## COUNT TWO - TITLE VII RETALIATION
### ABOR only

92. By reference hereto, Plaintiff hereby incorporates the preceding paragraphs.

93. Plaintiff engaged in several protected activities, including his participation in *Alozie I* and reporting a perceived discriminatory environment in connection with his application to be Dean, his pay, and the appointment process.

94. Defendant has retaliated against Plaintiff for engaging in protected activity by taking several adverse actions as described herein, in violation of Title VII.

95. As a direct and proximate result of Defendant's conduct, Plaintiff has sustained damages in the form of emotional distress, embarrassment, humiliation, loss of reputation, and loss of self-esteem.

96. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory practices until this Court grants relief.

## COUNT THREE – SECTION 1983 VIOLATION (DUE PROCESS)
### All Individual Defendants

97. By reference hereto, Plaintiff hereby incorporates the preceding paragraphs.

98. The Individual Defendants herein all acted under color of state law in their roles as supervisory officials employed by ABOR.

99. Plaintiff has a right to due process, namely the right to have his complaints investigated timely, the right to participate in job application processes for which he is qualified according to the postings, and his salary evaluated and set in accordance with state law.

100. The acts or failures to act of the Defendants and their subordinates deprived the Plaintiff of his due process rights.



101. Alternatively, Defendants set in motion a series of acts by subordinates, or knowingly refused to terminate a series of acts by those subordinate, that Defendants knew or reasonably should have known would cause the subordinates to deprive the Plaintiff of these rights.

102. Alternatively, the Defendants engaged in conduct that showed a reckless or callous indifference to the deprivation by the subordinate of the rights of others, which was a closely-related moving force causing Plaintiff's injuries.

103. Defendants unreasonably delayed the process for Plaintiff to exhaust his administrative remedies.

104. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory practices until this Court grants relief.

105. As a direct and proximate result of Defendants' conduct, Plaintiff has sustained damages in the form of emotional distress, embarrassment, humiliation, loss of reputation, and loss of self-esteem.

106. Plaintiff also seeks punitive damages as Defendants' actions were motivated by evil motive or intent, and/or reckless or callous indifference to the federally protected rights of others.

**COUNT FOUR – SECTION 1983 VIOLATION (42 U.S.C. § 1981 AND EQUAL PROTECTION)**

**All Individual Defendants**

107. By reference hereto, Plaintiff hereby incorporates the preceding paragraphs.

108. The Individual Defendants acted under color of state law.

109. Plaintiff is a member of a protected class based on his race and national origin.

110. At the time of the complained of events, Plaintiff had the clearly established Fourteenth Amendment constitutional right and the 42 U.S.C. § 1981 statutory right to be free from racial discrimination and retaliation in his employment by Defendants and generally receive equal treatment under the law, including the policies and procedures adopted by ABOR that have the force and effect of state law.

111. While Section 1981 does not permit direct claims against state actors, the Ninth Circuit has recognized that such claims may be brought against state actors under Section 1983.



112. Defendants' conduct was undertaken with the purpose of depriving Plaintiff of those rights, in violation of the Fourteenth Amendment and Section 1981.

113. Additionally, Defendants' actions have a disproportionate impact on African-American employees at ASU who cannot leave their administrative roles without substantial salary reduction, while non-African-Americans with less experience are hired in dual roles at substantially greater salaries and the purported 25% reduction when they return to faculty is either not fully enforced or has a much smaller impact due to the starting salary.

114. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory practices until this Court grants relief.

115. As a direct and proximate result of Defendants' conduct, Plaintiff has sustained damages in the form of emotional distress, embarrassment, humiliation, loss of reputation, and loss of self-esteem.

116. Plaintiff also seeks punitive damages as Defendants' actions were motivated by evil motive or intent, and/or reckless or callous indifference to the federally protected rights of others.

### COUNT FIVE - 42 U.S.C § 1983 (FIRST AMENDMENT)
### All Individual Defendants

117. By reference hereto, Plaintiff hereby incorporates the preceding paragraphs.

118. The Individual Defendants were acting under color of state law.

119. Plaintiff's right speak out and complain of race discrimination and retaliation, including statements during litigation in furtherance of those claims is protected by the First Amendment to the United States Constitution.

120. Plaintiff engaged in free speech when, among other things, he testified in court during Alozie I regarding the discrimination and retaliation he experienced at ASU, and, with respect to the allegations herein, filed complaints with the Office of University Rights and Responsibilities, and opposed the unlawful acts to his chain of command.

121. Plaintiff's speech was regarding a matter of public concern, and Plaintiff's interest in commenting on the matter outweighed any of the Defendants' interests.

122. As a result of Plaintiff's protected First Amendment speech, Defendants retaliated



and discriminated against Plaintiff as described above.

123. As a direct and proximate result of Defendants' conduct, Plaintiff has sustained damages in the form of emotional distress, embarrassment, humiliation, loss of reputation, and loss of self-esteem.

124. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' actions until this Court grants relief.

125. Plaintiff also seeks punitive damages as Defendants' actions were motivated by evil motive or intent, and/or reckless or callous indifference to the federally protected rights of others.

## COUNT SIX – CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS
### All Individual Defendants

126. By reference hereto, Plaintiff hereby incorporates the preceding paragraphs.

127. 42 U.S.C. § 1985 grants a direct cause of action for damages, jointly and severally, *inter alia*, against "two or more persons in any State or Territory [who] conspire to…injure such party or witness in his person or property on account of his having so attended or testified [in any court of the United States], or…for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws."

128. Dr. Alozie testified and attended in *Alozie I* in this Court as described herein.

129. On or more Defendants, by their conspiratorial actions, have violated this provision.

130. As a direct and proximate result of Defendants' conduct, Plaintiff has sustained damages in the form of emotional distress, embarrassment, humiliation, loss of reputation, and loss of self-esteem.

131. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' actions until this Court grants relief.

132. Plaintiff also seeks punitive damages as Defendants' actions were motivated by evil motive or intent, and/or reckless or callous indifference to the federally protected rights of others.



**JURY TRIAL DEMANDED**

133. Plaintiff demands a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment as follows:

A. Declaring that the acts and practices complained of herein are in violation of federal law and declare the rights and legal status of the parties vis-à-vis the offending contract language that conflicts with ABOR policy;

B. Directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff's employment or employment opportunities;

C. Directing Defendants to place Plaintiff in the position he would have occupied but for Defendants' unlawful actions, and make him whole for all earnings he would have received but for Defendant's unlawful actions, including, but not limited to, back pay, front pay, and other lost benefits;

D. Awarding Plaintiff compensatory damages in amounts to be determined by the jury;

E. Awarding punitive damages for Defendants' actions in their individual capacity taken in reckless disregard of Plaintiff's rights;

F. Awarding Plaintiff injunctive relief, to be fashioned by this Court, in a manner most effective at eliminating the complained-of actions;

G. Awarding Plaintiff pre- and post-judgment interest, the costs of this action, and reasonable attorneys' fees as provided by the statutes providing the causes of action cited herein; and

H. Granting such other and further relief as this Court deems necessary and proper.

Respectfully submitted on this 15th day of August, 2023,

CARDEN LIVESAY, LTD.

By: s/Joshua W. Carden
Joshua W. Carden
*Attorney for Plaintiff*
*Nicholas Alozie*

